**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

SHARON JOYCE et al.,
individually and on behalf of
all others similarly situated,

No. 23-cv-04281 (MEF)(AME)

*Plaintiffs*,

**OPINION and ORDER**

v.

JAGUAR LAND ROVER NORTH AMERICA,
LLC, et al.,

*Defendants*.

**Table of Contents**

I.    **Background**

    **A.**    **The Allegations**

    **B.**    **The Lawsuit**

    **C.**    **The Motion**

    **D.**    **The Court's Approach**

II.   **Standing**

    **A.**    **Basic Principles**

    **B.**    **Injury in Fact: In General**

    **C.**    **Injury in Fact: Here**

    **D.**    **The Counterarguments**

        **1.**    **Extent of Damage**

        **2.**    **Pervasiveness of Damage**

        **3.**    **Repairs**

        **4.**    **The Bargain Accounts for the Benefit**

    **E.**    **Conclusion**

III.  **Prudential Mootness**

**IV.**   **Preemption**

    **A.**   **Basic Principles**

    **B.**   **The Safety Act**

        **1.**   **Private Right of Action**

        **2.**   **Recall Cases**

    **C.**   **Conclusion**

**V.**   **The Texas Notification Requirement**

**VI.**   **Merits**

    **A.**   **The State Law Claims**

        **1.**   **The Warranty's Scope**

            **a)**   **Counterargument: "Uniform"**

            **b)**   **Counterargument: Cases**

        **2.**   **The Warranty's Terms**

    **B.**   **The Warranty Act**

**VII.** **Conclusion**

\*     \*     \*

Certain car buyers came to believe that their cars' batteries were not working properly.

They sued the manufacturer, alleging, among other things, that they had overpaid for their cars in light of the battery defect.

The manufacturer now moves to dismiss.

As to those parts of the motion taken up here, the motion is denied.

\*     \*     \*

**I.**   **Background**

    **A.**   **The Allegations**

The allegations[1] as relevant for now are as follows.

---

[1]  Because this is a motion to dismiss, the Court must treat all of the allegations as true.  See Ashcroft v. Iqbal, 556 U.S.

Various people[2] (the "Buyers") bought a Jaguar I-Pace (the "Car").  See Second Amended Complaint[3] ("Complaint") ¶¶ 12, 26, 38.

Each Car turned out to have a problem with its battery system.  See id. ¶¶ 51-52.  And this led to practical issues --- for example, the Car did not start as it was supposed to.  See id. ¶ 68.

To address these issues, the Car manufacturer[4] rolled out a software update.  See id. ¶ 24.

The update helped to predict when a battery failure might happen.  See id.  But it did not fully fix battery failures.  See id. ¶ 79.

### B.    The Lawsuit

In light of the above, the Buyers sued the Car manufacturer. They did so on behalf of a putative class of people who bought or leased the Cars.  See id. ¶¶ 9-10, 82-87.

---

662, 678 (2009).  Whether they are in fact true --- that is a question for later in the case.

[2]  Sharon Joyce, Nancy Jors, and Vikas Venkatachala.

[3]  The Defendant's motion to dismiss was directed against the First Amended Complaint.  After it was filed, the Court identified a possible wrinkle as to its jurisdiction.  See Joyce v. Jaguar Land Rover N. Am., LLC, 2024 WL 4969963 (D.N.J. Dec. 3, 2024).  To address the issue, a new complaint was filed by the Plaintiffs.  It is the Second Amendment Complaint.  There are no substantive differences between the First Amended Complaint and the Second Amended Complaint, just small tweaks related to the jurisdictional issue.  To save them time and expense, the Court told the parties there was no need to file new motion-to-dismiss briefs.  Accordingly, the briefs filed when the First Amended Complaint was on the table are the ones cited throughout this Opinion and Order (even though the Second Amended Complaint is the one that is now operative).

[4]  Jaguar Land Rover North America, LLC.

From here, the Buyers are "the Plaintiffs," and the Car manufacturer is "the Defendant."[5]

\*     \*     \*

The Plaintiffs press ten claims.

There are two ways to get a quick handle on them.

The first way: by separating out the ten claims based on the law they arise under.  Under California law, there are five claims.[6] Under Texas law, there are three claims.[7]  And under federal law there are two claims.[8]

A second way to divide things up is by looking to the basic gist of the claims.

Some claims (Counts I, IV, V, and VIII) are based on the Defendant misleading or deceiving the Plaintiffs.  See id. ¶¶ 110, 158, 168, 192.

Others (Counts III, VII, and X) are based on implied warranties.

The rest, express warranty claims, are the focus of this Opinion and Order.

---

[5]  The Plaintiffs also sued "Does 1 through 60."  Those people have not been identified or served.  They are not considered here by the Court.

[6]  Count I (Violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq. --- Injunctive Relief); Count II (Violation of the Song-Beverly Consumer Warranty Act ("SBA"), Cal. Civ. Code § 1790 et seq. --- Breach of Express Warranty); Count III (Violation of the SBA, Cal. Civ. Code § 1792 --- Breach of Implied Warranty); Count IV (Violation of the Unfair Business Practices Act, Cal. Bus. & Prof. Code § 17200 et seq.); Count V (Breach of the Covenant of Good Faith and Fair Dealing).

[7]  Count VI (Breach of Express Warranties, Tex. Bus. & Com. Code § 2.313; Count VII (Breach of Implied Warranties, Tex. Bus. & Com. Code § 2.104); Count VIII (Violation of the Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.50 et seq.).

[8]  Count IX (Violation of the Magnuson-Moss Warranty Act ("Warranty Act"), 15 U.S.C. § 2301 et seq. --- Written Warranty); Count X (Violation of the Warranty Act, id. --- Implied Warranty).

These are Counts II, VI, and IX.

These claims rest on the same core allegation: the Defendant took on warranty obligations but did not live up to them.  How? Under the written warranty it had given, it promised to fix the Car batteries if they broke --- but did not.  See id. ¶¶ 129, 172-73, 206-12.

From here, the claims at Counts II, VI, and IX are collectively called the "Warranty Claims."

### C.    The Motion

The Defendant has moved to dismiss the Warranty Claims.

It argues that the Court cannot take them up, mainly because the Plaintiffs do not have standing and because the Warranty Claims are preempted by federal law.

And the Defendant argues that if the Court does take up the Warranty Claims it must dismiss them on the merits, because they do not state a claim.

### D.    The Court's Approach

First the Court considers the various threshold issues.  See Parts II, III, IV, and V.

The Court concludes: these do not cut things off; the Court can get to the merits of the Warranty Claims.

Next, the Court moves to the merits and assesses the Plaintiffs' claims for breach of express warranty under state law, see Part VI.A, and the federal Warranty Act.  See Part VI.B.

The Court concludes: the motion to dismiss the Warranty Claims for failure to state a claim must be denied.

## II.   Standing

"Jurisdiction is, as always, the 'first and fundamental question,'" Baymont Franchise Sys., Inc. v. Narnarayandev, LLC, 348 F.R.D. 220, 227 (D.N.J. 2024) (quoting Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)), and standing is a necessary ingredient of the Court's jurisdiction.[9]

---

[9]  The reason: federal courts exercise the "judicial Power of the United States."  U.S. Const., art. III, § 1.  That power

Accordingly, the stepping-off point here is this: do the Plaintiffs have standing as to their Warranty Claims?

Yes, the Court concludes.  This Part explains why.

### A.    Basic Principles

Start with the ground rules as to standing.

First, who has to establish that there is standing?

The Plaintiffs.  See Cottrell v. Alcon Lab'ys, 874 F.3d 154, 162 (3d Cir. 2017) ("[T]he party invoking federal jurisdiction, bears the burden of establishing . . . Article III standing[.]") (cleaned up).

Second, what must the Plaintiffs establish?

That they "have (1) suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the [D]efendant, and (3) that is likely to be redressed by a favorable judicial decision."  Huertas v. Bayer US LLC, 120 F.4th 1169, 1174 (3d Cir. 2024) (cleaned up).

Third, to what standard must the Plaintiffs establish these things, and how must the Court analyze whether they have?

"To maintain [the] fundamental separation between standing and merits at the [motion to] dismiss[] stage, [the Court] assume[s] for the purposes of [its] standing inquiry that [the Plaintiffs have] stated valid legal claims."  Cottrell, 874 F.3d at 162; see generally Warth v. Seldin, 422 U.S. 490, 500 (1975) (standing "in no way depends on the merits of [the Plaintiffs'] contention that particular conduct is illegal"); see also Dunne v. Elton Corp., 2024 WL 4224619, at *5 n.15 (3d Cir. Sept. 18, 2024) (collecting cases).

---

"extends only to 'Cases' and 'Controversies.'"  Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016) (quoting id.).  And "a case or controversy can exist only if a plaintiff has standing to sue."  United States v. Texas, 599 U.S. 670, 675 (2023).

Therefore, the Court asks only "whether [the Plaintiffs] plausibly allege[] [they were] injured[10] under [their] theory of the underlying legal claims." Falcone v. Dickstein, 92 F.4th 193, 202-03 (3d Cir. 2024).

And in answering this question, the Court "must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the [the Plaintiffs]". In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012) (cleaned up).

### B.    Injury in Fact: In General

With this background in mind, come to the parties' main standing dispute --- as to whether the Plaintiffs have cleared the injury-in-fact bar.

This injury requirement "serves to distinguish a person with a direct stake in the outcome of a litigation --- even though small --- from a person with a mere interest in the problem." United States v. Students Challenging Regul. Agency Procs., 412 U.S. 669, 689 n.14 (1973); see also FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024).[11]

---

[10]   The Court focuses here only on the first factor (injury), and not the second and third factors (causation and redressability). The reason why is set out in footnote 17.

[11]   The "direct stake" inquiry advances a number of goals; these include helping to protect federalism values and also the federal Executive Branch's Article II powers.  If a person is allowed to sue even though she does not have her own direct stake in a case, then in a certain sense she is acting out of the "general" concern of a "bystander," All. for Hippocratic Med., 602 U.S. at 379 --- suing to see the law enforced properly on behalf of the public as a whole.  See Allen v. Wright, 468 U.S. 737, 756 (1984).  But in our system, it is typically public entities that sue to protect diffuse and purely public interests.  These public entities might be federal agencies, specially empowered to sue on behalf of the community, whether or not those agencies are themselves injured.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 576 (1992).  Or these entities might be states, which sometimes have parens patriae powers to sue on behalf of all their citizens.  See generally Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez, 458 U.S. 592, 607 (1982).  Standing doctrine helps to ensure that a person

The Third Circuit has said that this "requirement is very generous to claimants, demanding only that the claimant allege some specific, identifiable trifle of injury." Cottrell, 874 F.3d at 162 (cleaned up).

Here, as to the Warranty Claims, the Plaintiffs argue they have alleged an injury in fact based on economic harm. See Opposition Brief at 7.

An economic injury is one of the "paradigmatic forms" of injury in fact. Huertas, 120 F.4th at 1174 (quoting Danvers Motor Co. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005)).

And it can come packaged in a number of ways. See generally Danvers Motor Co., 432 F.3d at 291-93.

"One way a plaintiff might successfully plead an economic injury is by alleging that she bargained for a product worth a given value but received a product worth less than that value." Huertas, 120 F.4th at 1174 (quoting In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig. ("J&J"), 903 F.3d 278, 283 (3d Cir. 2018)).

"This is known as the benefit-of-the-bargain theory of injury." Id.

To establish standing on this theory, a "plaintiff must . . . allege facts that would permit a factfinder to value the purported injury at something more than zero dollars." J&J, 903 F.3d at 285. "[T]he economic injury is calculated as the difference in value between what was bargained for and what was received." Id.

---

with no connection to a case does not take for herself a job (suing for us all) that otherwise belongs to electorally-accountable parts of our government, whether federal agencies or states. As to these issues, see, for example, Alliance for Hippocratic Medicine, 602 U.S. at 380; TransUnion LLC v. Ramirez, 594 U.S. 413, 429-30 (2021); Sierra v. City of Hallandale Beach, 996 F.3d 1110, 1133 (11th Cir. 2021) (Newsom, J., concurring); Church v. Collection Bureau of Hudson Valley, Inc., 704 F. Supp. 3d 521, 535 n.30 (D.N.J. 2023).

**C.    Injury in Fact: Here**

With the benefit-of-the-bargain idea in mind, zero in now on the Plaintiffs' injury theory.

The basic allegations that support that theory:

The Plaintiffs bought Cars.  See Complaint ¶¶ 9-10.  The Cars were supposed to have working battery systems.  See id. ¶¶ 51, 66.  But the battery systems malfunctioned.  See id. at ¶ 68.  This led to reduced driving range, among other issues.  See id. ¶¶ 67-68.

The Court concludes that this adds up to an Article III injury in fact, and explains why here.

*    *    *

It is "plausible," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), that a consumer would pay more for (a) a car with working batteries and longer range than (b) a car with defective batteries and shorter range.

And that is in essence what the Plaintiffs say here: they paid for (a) but got (b) --- and the difference between them amounts to the loss they have suffered, their injury.

Cars with a battery defect could plausibly be "worth less than a properly manufactured" version without a battery defect, Huertas, 120 F.4th at 1175 --- and the alleged "impairment of value is fairly obvious."  Burbank v. BMW of N. Am., LLC, 2022 WL 833608, at *10 (D.N.J. Mar. 21, 2022) (cleaned up).

And none of this is particular to cars.

Window units, for example, are supposed to spew cold air on command.  But say this one generates only mildly cool air, and only sometimes.  The person who bought the air conditioner has been injured on a benefit-of-the-bargain theory.  He paid for ("bargained for") working A/C.  But he did not get the full "benefit" of working A/C.  And the gap between the two --- between what he paid for and what he got --- is the injury.

All of this is common sense.  See generally Finkelman v. Nat'l Football League, 810 F.3d 187, 201 (3d Cir. 2016) (in assessing allegations of injury at the motion-to-dismiss stage, "federal

courts typically credit allegations of injury that involve no more than application of basic economic logic") (cleaned up); Huertas, 120 F.4th at 1175 (crediting allegation of economic injury where "[t]he logic requires little elaboration").

And all of this explains how the Plaintiffs would have standing here as to any number of bread-and-butter claims --- a product-defect claim, for example.  See, e.g., Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1086 (11th Cir. 2019); Springer v. Cleveland Clinic Emp. Health Plan Total Care, 900 F.3d 284, 287-88 (6th Cir. 2018); Kuhns v. Scottrade, Inc., 868 F.3d 711, 716 (8th Cir. 2017).

Take one more step now, to see how the benefit-of-the-bargain theory gives the Plaintiffs standing as to their Warranty Claims.

The Plaintiffs, as just noted, allege a gap between the Cars they paid for and the Cars they received.  By promising repairs, the warranty here was allegedly designed to seal up that gap --- by getting the Cars fixed, and putting them in the condition they were supposed to have been in when the Plaintiffs bought them.  See Complaint ¶¶ 129, 172-73, 206-12.  But, the Plaintiffs allege, the Defendant did not honor its warranty. See id.

In the end then, it is the alleged failure to comply with the warranty that left the Plaintiffs back where they were --- with an unremedied difference between "bargain" and "benefit."

And that is an injury for standing purposes.  See, e.g., Cole v. Gen. Motors Corp., 484 F.3d 717, 723 (5th Cir. 2007) (so holding); Aberin v. Am. Honda Motor Co., 2021 WL 1320773, at *6 (N.D. Cal. Mar. 23, 2021) (same); In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1162 (C.D. Cal. 2010) (same).[12]

---

[12]  As noted in Part II.A, the Court takes the Plaintiffs' legal theory as valid for the purposes of the standing analysis. See Warth, 422 U.S. at 500; Cottrell, 874 F.3d at 162; Dunne, 2024 WL 4224619, at *5 n.15; Cole, 484 F.3d at 723; Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008). And note that their theory is not obscure in some way. Warranties that promise repairs, as this one is alleged to, are

*    *    *

As to all this, a recent Third Circuit case, Huertas v. Bayer US LLC, 120 F.4th 1169 (3d Cir. 2024), is on point.

The Huertas plaintiffs, like the Plaintiffs here, raised an express warranty claim.  See Huertas v. Bayer U.S., LLC, 2023 WL 3773139, at *6 (D.N.J. May 23, 2023).

They bought products that contained benzene, a carcinogen.  See Huertas, 120 F.4th at 1172.  And after the manufacturer recalled the products, the buyers sued.  See id. at 1173.

The plaintiffs alleged no physical harm from the carcinogen. See id. at 1172.  "Instead, they [sought] compensation for economic losses they allegedly suffered from purchasing products that they claim[ed] are worth less than the uncontaminated products for which they bargained."  Id.

The district court dismissed the plaintiffs' complaint for lack of standing.  See id.  But the Third Circuit reversed in relevant part.  It held that the plaintiffs had established standing under a benefit-of-the-bargain theory.  See id. at 1172, 1175.

The reason: the "[p]laintiffs have plausibly alleged that . . . products that are unusable due to the contamination are necessarily worth less than the product when properly manufactured."  Id. at 1175.  And because the products were worth less, the plaintiffs were deprived of the benefit of their bargain for their warranty.  See id.

As in Huertas, so too here.

---

often read to promise that the repairs will work, not just that they will be tried.  See, e.g., Lujan v. Navistar, Inc., 2021 WL 56184, at *3 (Tex. Ct. App. Jan. 7, 2021); Mercedes-Benz of N. Am., Inc. v. Dickenson, 720 S.W.2d 844, 854 (Tex. Ct. App. 1986); Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp., 844 F.2d 1174, 1179 (5th Cir. 1988); Abrot v. Mercedes-Benz USA, LLC, et al., 2023 WL 12011481, at *2 (C.D. Cal. Aug. 31, 2023); Chillon v. Ford Motor Co., 2023 WL 5207506, at *3 (C.D. Cal. May 8, 2023); Guzzetta v. Ford Motor Co., 2023 WL 5207429, at *6-7 (C.D. Cal. July 3, 2023); cf. Oregel v. Am. Isuzu Motors, Inc., 90 Cal. App. 4th 1094, 1103 (2001).

The Plaintiffs in this case, as noted, have plausibly alleged that the Cars were worth less than they paid for them because of defects --- and the warranty did not come in to fix things. This is a benefit-of-the-bargain injury under Huertas.

### D.   The Counterarguments

Against the conclusion that the Plaintiffs have alleged an Article III injury, the Defendant presses four counterarguments. Take them one at a time.

#### 1.   Extent of Damage

The Defendant first suggests that Huertas does not control.  In Huertas, the argument goes, the products in question were useless; here, the Plaintiffs' Cars still work.  See Letter of November 19, 2024, at 2.

But the benefit-of-the-bargain theory does not require that a product be worthless --- only that it be "worth less than a properly manufactured product."  Huertas, 120 F.4th at 1175.  A plaintiff need only "allege facts that would permit a factfinder to value the purported injury at something more than zero dollars."  J&J, 903 F.3d at 285.

Huertas made this clear: "We do not decide whether contaminated products are necessarily 'worthless,' as [the] Plaintiffs allege.  Having concluded that [the] Plaintiffs' theory is viable, we need not determine precisely how much less contaminated products are worth."  Huertas, 120 F.4th at 1176 n.9.

An "injury in fact" requires "an invasion of a legally protected interest," Lujan, 504 U.S. at 560, not a full destruction of it.

#### 2.   Pervasiveness of Damage

The Defendants' second counterargument: the defect in Huertas was more "pervasive" than the battery defect here.  See Letter of November 19, 2024, at 2.  A high share of the product at issue in Huertas allegedly contained benzene, but, per the Defendants, none of the Cars here "has ever experienced a thermal event."  See id.

But this does not move the needle.

Damages (or even liability) may turn on whether a problem is very pervasive or only somewhat pervasive, on whether there were or were not thermal events.

But the standing inquiry assumes the Plaintiffs' liability theory works, see Cottrell, 874 F.3d at 162 --- and then asks whether, under that theory, the Plaintiffs have "successfully plead[ed] an economic injury." Huertas, 120 F.4th at 1174.

Here, they have.

As noted, the Plaintiffs have alleged a gap, unremedied by the warranty, between the value (in money) that they paid for the Cars and the value (converted into money) of what they got.

And that alleged gap is there whether there was a "thermal event" or not. The reason: Car battery defects are said to have consequences other than thermal events. See Complaint ¶ 68 (alleging the battery defect led to, among other things, failures in the regenerative-braking system, the 12-volt battery system, and the rear-view cameras, as well as diminished battery-charging capacity).

And it is plain that these could pare back the worth of the Car --- even if there were not thermal events to further reduce the Car's value. See generally J&J, 903 F.3d at 285 (holding that injury-in-fact requirement is satisfied if the relevant allegations "would permit a factfinder to value the purported injury at something more than zero dollars").

### 3.  Repairs

The Defendant tries to sidestep Huertas in a third way. In Huertas, the argument goes, the manufacturer "failed to repair the defective products," whereas here the Defendant "has undertaken to repair the vehicles --- for free." See Letter of November 19, 2024, at 2.

But this misses the point.

Whether required by a warranty or not, a full fix of a defect might well eliminate the daylight that had been there between what was paid for and what was received --- and if so, that could potentially eliminate any possible injury.

This is the core lesson of <u>Hayes</u> v. <u>Wal-Mart Stores, Inc.</u>, 725 F.3d 349 (3d Cir. 2013).

There, the defendant, a store, sold the plaintiff an as-is TV, along with a warranty to cover it.  <u>See</u> <u>id</u>. at 352-53.  The plaintiff soon learned that certain parts were missing.  When he asked the defendant for those parts, it told him the warranty, sold by mistake, did not cover the TV.  But the store eventually gave him the parts anyway.  <u>See</u> <u>id</u>. at 353.

The plaintiff sued.  The district court found that he had not suffered an injury, and the court of appeals agreed.  <u>See</u> <u>id</u>. at 361 n.10.  The reason: "he accepted [the defendant's] actions in compliance with the [warranty] and was made whole."  <u>Adam</u> v. <u>Barone</u>, 41 F.4th 230, 234 (3d Cir. 2022) (interpreting <u>Hayes</u>).

The Defendant here, by contrast, has allegedly not honored the warranty.  It did not "make [the Plaintiffs] whole" --- and therefore left them where they were, with the Article III injury they already had, a disjunct between "bargain" (what they paid for) and "benefit" (what they got).

If a full fix <u>had</u> made the Plaintiffs whole, as in <u>Hayes</u>, there might not be standing based on a benefit-of-the-bargain theory.  Why?  Because there would no longer be benefit/bargain daylight to point to.  <u>See</u>, <u>e.g.</u>, <u>Waller</u> v. <u>Hewlett-Packard Co.</u>, 295 F.R.D. 472, 487-88 (S.D. Cal. 2013).

But <u>trying</u> to make a repair without success is not the same as <u>successfully</u> making a repair.

The latter can potentially collapse the space between what was bargained for and what was received.  The former cannot.

And in this case, the allegations are that the Defendant's repair attempts have failed.  <u>See</u> Complaint ¶¶ 55-56, 59, 61, 79; <u>see</u> <u>also</u> Part III.A.2.  These allegations put the Defendant on the same footing as the manufacturer in <u>Huertas</u>.  Each failed to fully repair its product, and this left behind the injury that was already there, the one created by the product's alleged defect.[13]

_____

[13]  There may be other problems with the Defendant's counterargument.  A full fix at Time 3 of a car that was bought at Time 1 does not purport to compensate the buyer for any

### **4.    The Bargain Accounts for the Benefit**

The Defendant's final counterargument: <u>Huertas</u> does not govern this case because defects in drugs (as in <u>Huertas</u>) are rare --- but defects in cars (as here) are common enough, and "vehicle recalls occur regularly." <u>See</u> Letter of November 19, 2024, at 2.

The argument appears to be this: there was no gap here between bargain (what was paid) and benefit (what was received) because when they go to the showroom buyers roughly expect that cars might be defective (and presumably also that the warranty they have been given might not work out).  This expectation is priced in --- consumers pay less for a car in light of it.  Therefore, the argument seems to go, there is no real divide between what was paid and what was received; consumers pay less upfront, because they have a feel for what they may well get in the end (a possibly defective car, a possibly dishonored warranty).

But this argument, if it is indeed being made, runs aground on common sense.

There are plainly things consumers price in.  No one could seek to recover from a sneaker company a few months after buying a pair of high-tops on the theory that the soles have worn down and the laces have become frayed.  This is because wear and tear is ordinary.  Consumers buy sneakers expecting it, and pay a (lower) price on the front-end that reflects their expectation of where things will go on the back-end.

But it defies everyday experience to think that car customers would shrug at serious alleged defects or dishonored warranties because they expected them in some way all along, and paid a lower price accordingly.[14]

---

actionable diminishment in the value to her of the car as she drove it around at Time 2.  In this sense, a fix at Time 3 is a bit different than, say, a settlement payment; the fix does not in an obvious way aim to address any pre-Time 3 loss of value that might be recoverable, but a settlement payment might.

[14]  And not just everyday experience. <u>See</u>, <u>e.g.</u>, George L. Priest, <u>A Theory of the Consumer Product Warranty</u>, 90 Yale L.J. 1297, 1308 (1981) (stating that a buyer pays "a premium in the sale price" in exchange for a warranty); <u>see also</u> Pranav Jindal,

And even if customers do discount what they are willing to pay for a car based on their estimate as to the odds that the car will later turn out to be defective --- why does it make sense to think that customers discount cars precisely the right amount upfront, so that when things later go awry everything ends up just-so, and it turns out, looking back, that the customers did not actually overpay?

And same problem as to the warranty.  A car customer may potentially pay less for a warranty because he prices in a sort of counter-party risk, that the car company will not ultimately honor the warranty.  But it is a stretch to imagine that the car buyer not only prices the risk ex ante --- but prices it so accurately that there can be no "plausible," Twombly, 550 U.S. at 570, ex post damages.  After all, accurate ex ante pricing would need to be based on something very hard to come by --- accurate information about the future (here, as to the likelihood of certain possibilities coming to pass as to defects and warranties).[15]

---

Risk Preferences and Demand Drivers of Extended Warranties, 34 Mktg. Sci. 39, 39 (2015) (similar); Alan Schwartz, Proposals for Products Liability Reform: A Theoretical Synthesis, 97 Yale L.J. 353, 362 (1988) (similar); Thomas J. Miceli, The Economic Approach to Law 133 (2009) (similar); Henry N. Amato et al., A General Model of Future Period Warranty Costs, 51 Acct. Rev. 854, 860–61 (1976) (similar).

[15]  It would also need to be based on an accurate method for pricing warranties before factoring in a future-non-compliance discount.  But such a method may be hard to come by, too.  One way to think about warranties is as insurance contracts, not between a consumer and a third-party insurance company, but between a consumer and the seller.  The present value of insurance contracts can be estimated using options-pricing models.  See Robert C. Merton, Applications of Option-Pricing Theory: Twenty-Five Years Later, 88 Am. Econ. Rev. 323, 336–37 (1998); Samuel H. Cox & Robert G. Schwebach, Insurance Futures and Hedging Insurance Price Risk, 59 J. Ins. & Risk 628 (1992). But there are any number of those.  See Ahmet K. Karagozoglu, Option Pricing Models: From Black-Scholes-Merton to Present, 29 J. Derivatives, No. 4, 2022, at 61; Neil A. Chriss & Ira Kawaller, Black-Scholes and Beyond: Option Pricing Models (1996).

To be sure, there are certain marketplace contexts in which it can be taken as a given that some information about the probability of future events is reflected in current prices. See generally Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970). But is there any reason to think that the consumer-facing car market is one of those "efficient" markets? If there is such a reason, no one has offered it up here. And deciding whether a particular market may be efficient, and indeed is efficient --- these are not small things, of the sort that can be simply assumed. See generally Hacker v. Elec. Last Mile Sols. Inc., 722 F. Supp. 3d 480, 494–95 & n.25 (D.N.J. 2024).

### E.    Conclusion

The question here is whether the Plaintiffs have plausibly alleged an economic injury, based on "no more than application of basic economic logic." Finkelman, 810 F.3d at 201 (cleaned up). They have. The Plaintiffs have alleged an injury in fact under the benefit-of-the-bargain theory, see Part II.C, and the Defendant's counterarguments do not change the picture, see Part II.D.[16] Therefore, the Plaintiffs have standing to sue.[17]

### III. Prudential Mootness

The Defendant raises a second threshold issue: it "will buy back (rather than entirely repair)" the 2019 model of the Car under the supervision of the federal government, see Letter of

---

[16] The Plaintiffs put forth other injury theories. See Opposition Brief at 6–12. But those do not need to be walked through here. "Because [the Court] conclude[s] that Plaintiffs can rely on a benefit-of-the-bargain theory, [it] do[es] not reach the[] alternative bases for establishing injury-in-fact." Huertas, 120 F.4th at 1175 n.8; see also Danvers Motor Co., 432 F.3d at 293.

[17] Once injury in fact has been established, the two other parts of Article III standing, causation and redressability, readily follow here, as they do in the large majority of damages cases. This is because the alleged economic loss is "fairly traceable to [the Defendant's unsuccessful repairs]," and the Plaintiffs' alleged loss of money "could be redressed by a favorable monetary award." Grasso v. Katz, 2023 WL 4615299, at *2 (3d Cir. July 19, 2023); see also All. for Hippocratic Med., 602 U.S. at 381.

November 29, 2024, at 2 n.1, and this is a reason for the Court not to hear this case, under the prudential mootness doctrine.

The law here in a nutshell:

"[P]rudential mootness is discretionary." Brown v. Buhman, 822 F.3d 1151, 1165 n.15 (10th Cir. 2016); accord Sierra Club v. U.S. Army Corps of Eng'rs, 277 F. App'x 170, 172 (3d Cir. 2008); 13B C. Wright & A. Miller, Fed. Prac. & Proc. Juris. § 3533.1 (3d ed. 2024).  It allows a court to "decline to exercise [its] discretion to grant declaratory and injunctive relief if the controversy is so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant."  Sierra Club, 277 F. App'x at 172 (cleaned up).

For now, the Court will use its discretion to keep the case going, rather than to cut it off based on prudential mootness.

There are four reasons why.

\*        \*        \*

First, the Defendant made its prudential mootness argument in a footnote in a letter; the letter focused on another subject, a then-new Third Circuit standing opinion.  See Letter of November 29, 2024.

This is a glancing, squint-or-you-might-miss-it argument.  The Defendant's prudential mootness contention has "not [been] squarely argued," John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997), with appropriate time and space for a response from the Plaintiffs.  Cf. Johnson v. MetLife Bank, N.A., 883 F. Supp. 2d 542, 550 (E.D. Pa. 2012) (argument pressed in a footnote is waived, in part because "the complexities of [the issue] require briefing and factual development for [the court] to make an informed ruling on this argument").

Second, "[w]hile [courts] generally hold a case moot when a coordinate branch steps in to resolve the problem, [they] don't do so without first accounting for the possibility of failure." Winzler v. Toyota Motor Sales U.S.A., Inc., 681 F.3d 1208, 1211 (10th Cir. 2012).

Here, the Court has no way to "account[]" for that possibility. The Court has before it no meaningful information as to the asserted buyback program.  For example, no declarations have been filed as to the purported scope or terms of any buyback program or what the federal government's role in it might be.

Third, it is unclear why a buyback program might be a basis for mooting out all of this case.  Prudential mootness generally

focuses on forward-looking relief.  <u>See</u> <u>Sierra Club</u>, 277 F. App'x at 172 (discussing prudential mootness as being about "declaratory and injunctive relief"); <u>accord</u>, <u>e.g.</u>, <u>Blanciak</u> v. <u>Allegheny Ludlum Corp.</u>, 77 F.3d 690, 700 (3d Cir. 1996); <u>Chamber of Com. of U.S. of Am.</u> v. <u>U.S. Dep't of Energy</u>, 627 F.2d 289, 292 (D.C. Cir. 1980).  But what about the backward-looking aspects of this case?  The Plaintiffs have sought only damages on their express warranty claims.  Why should a buyback be allowed to extinguish those claims?

<u>Fourth</u>, while the buyback is said to relate to the Car's 2019 model, this case also concerns allegations as to the 2020 model. <u>See</u> Complaint ¶ 12.  Prudential mootness aims, in part, to save "judicial resources."  <u>Winzler</u>, 681 F.3d at 1215.  But trimming off claims as to the 2019 Cars would only whittle away at this case to a limited extent; the main work would still need doing.

*    *    *

In short: for now, the Court exercises its discretion not to invoke the prudential mootness doctrine.

After the motion to dismiss is fully resolved, the Defendant may raise prudential mootness on a schedule to be set by the Court.

## IV.  <u>Preemption</u>

The Defendant next presses another threshold argument --- that the Warranty Claims cannot go forward because a federal statute, the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. § 30101 et seq., preempts them.  <u>See</u> Motion to Dismiss at 11.

The Court's conclusion: preemption does not shut down the Warranty Claims.[18]

---

[18]  Two things.  <u>First</u>, as to the state Warranty Claims, note that the Plaintiffs seek only damages, <u>see</u> Complaint ¶¶ 133-34, 145-48, 181, 188, not a declaration or an injunction.  <u>Second</u>, one of the Warranty Claims is based on a federal statute, the Warranty Act.  <u>See</u> footnote 8.  That statute cannot be preempted by federal law because it <u>is</u> a federal law, not a state one. <u>See</u> <u>Bruce Lee Enters., LLC</u> v. <u>A.V.E.L.A., Inc.</u>, 2013 WL 822173, at *22 n.19 (S.D.N.Y. Mar. 6, 2013); <u>see</u> <u>also</u> <u>United States</u> v. <u>Delaware Dep't of Ins.</u>, 2021 WL 3012728, at *9 (D. Del. July 16, 2021), <u>report and recommendation adopted</u>, 2021 WL 4453606 (D. Del. Sept. 29, 2021), <u>aff'd sub nom.</u> <u>United States</u> v. <u>Dep't of Ins.</u>, 66 F.4th 114 (3d Cir. 2023).  The analysis in this Part IV uses the previously defined term "Warranty Claims" for ease of

This Part explains why.

## A.    Basic Principles

Under the Constitution, "the Laws of the United States
. . . shall be the supreme Law of the Land; . . . any Thing in
the . . . Laws of any State to the Contrary notwithstanding."
U.S. Const. art. VI, cl. 2.

When the just-quoted Supremacy Clause is in play, state law is
pushed aside in favor of federal law.  This displacement is
preemption.  See Cipollone v. Liggett Grp., Inc., 505 U.S. 504,
516 (1992).

"Federal law can preempt state law in three ways: (1) express
preemption, (2) field preemption, and (3) conflict preemption."
Farina v. Nokia Inc., 625 F.3d 97, 115 (3d Cir. 2010) (citing
Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707,
713 (1985)).

Per the Defendant, conflict preemption is the sort of preemption
at issue here.  See Reply Brief at 3, 4 n.2.

The nub of conflict preemption: state law is "nullifie[d] . . .
inasmuch as it conflicts with federal law, either where
compliance with both laws is impossible or where state law
erects an obstacle to the accomplishment and execution of the
full purposes and objectives of Congress."  Farina, 625 F.3d at
115 (cleaned up).

## B.    The Safety Act

The basis for the Defendant's preemption argument: it carried
out a recall under the Safety Act, which means that the Act, a
federal statute, preempts the state-law Warranty Claims.  See
Motion to Dismiss at 11-14.

But this is not persuasive.

Congressional intent is the touchstone of preemption analysis,
see Cipollone, 505 U.S. at 516, and the basic place to find that
intent is in the words Congress chose.  See Sprietsma v. Mercury

---

reference.  But the analysis in this Part IV does not concern
the federal Warranty Act claim.

Marine, a Div. of Brunswick Corp., 537 U.S. 51, 62-63 (2002); CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

The Safety Act says that the recall scheme it lays out does not "affect a warranty obligation under a law of . . . a State" and "is in addition to other rights and remedies under other laws of . . . a State."  49 U.S.C. § 30103(d).

This Safety Act "savings clause" explicitly carves out room for state-law warranty claims.

And in light of this clause, every court that has considered the question had landed on the same conclusion: to the extent state-law warranty claims seek only damages,[19] they are not preempted by the Safety Act.  See Kavon v. BMW of N. Am., LLC, 605 F. Supp. 3d 622, 634 (D.N.J. 2022); Burbank, 2022 WL 833608, at *7; Cohen v. Subaru of Am., Inc., 2022 WL 721307, at *37 (D.N.J. Mar. 10, 2022); Paris Limousine of Okla., LLC v. Exec. Coach Builders, Inc., 867 F.3d 871, 873-74 (8th Cir. 2017); Flynn v. FCA US LLC, 2016 WL 5341749, at *4 (S.D. Ill. Sept. 23, 2016); McQueen v. BMW of N. Am., LLC, 2013 WL 4607353, at *4 (D.N.J. Aug. 29, 2013); Cuellar v. Ford Motor Co., 296 Wis. 2d 545, 564 (Ct. App. 2006); In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig., 2004 WL 1170145, at *3, *8 (N.D. Ohio May 19, 2004); Littel v. Bridgestone/Firestone, Inc., 259 F. Supp. 2d 1016, 1024-25 (C.D. Cal. 2003); Shields v. Bridgestone/Firestone, Inc., 232 F. Supp. 2d 715, 720 (E.D. Tex. 2002); Miller v. Bridgestone/Firestone Inc., 2000 WL 1570732, at *4 (E.D. Pa. Oct. 19, 2000); see also McGettigan v. Ford Motor

---

[19]  Typically, "it is assumed that the full cause of action under state law is available (or . . . pre-empted)."  Int'l Paper Co. v. Ouellette, 479 U.S. 481, 498 n.19 (1987).  The full package of remedies --- damages, declarations, injunctions, etc. --- is available to a plaintiff, or none of them are.  But this baseline assumption may not hold if "there is evidence that Congress meant to 'split' a particular remedy for pre-emption purposes."  Id.  And here, there may be such "evidence."  See Kevin M. McDonald, Federal Preemption of Automotive Recalls: A Case of Too Many Backseat Drivers?, 71 Tenn. L. Rev. 471, 503 (2004); cf. Flynn, 2016 WL 5341749, at *5.  But none of this needs to be taken on here.  The reason: as noted, see footnote 18, the Plaintiffs in this case seek only damages under their state Warranty Claims, not a declaration or an injunction.

Co., 265 F. Supp. 2d 1291, 1298 (S.D. Ala. 2003) (on preemption of the Warranty Act).

This need not always be the end of the analysis.

A savings clause "does not bar the ordinary working of conflict pre-emption principles that find implied pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Sprietsma, 537 U.S. at 65 (cleaned up); accord Geier v. Am. Honda Motor Co., 529 U.S. 861, 869 (2000).

But it falls to the Defendant, which bears the burden of persuasion, see Wyeth v. Levine, 555 U.S. 555, 573 (2009), to make an argument about impossibility or obstacles. It has not done so.[20]

### C.   Counterarguments

The Defendant makes two general preemption-related counterarguments. See Motion to Dismiss at 11-14.

It is not clear whether they are intended to suggest conflict preemption as to the Warranty Claims, or only as to other claims of the Plaintiffs'.

---

[20]  And arguments along these lines would likely be an uphill climb. On first glance, impossibility looks hard to establish. See, e.g., Burbank, 2022 WL 833608, at *7 (rejecting impossibility argument in this context). And it is not easy to see how the Warranty Claims might work as "obstacles" to Congress' aims. "The Safety Act is concerned with safety --- getting unsafe vehicles off the road --- not with ensuring that consumers receive the benefit of the bargain." Kavon, 605 F. Supp. 3d at 633 (citing Buzzard v. Roadrunner Trucking, Inc., 966 F.2d 777, 783 (3d Cir. 1992) and Chamberlan v. Ford Motor Co., 314 F. Supp. 2d 953, 963 (N.D. Cal. 2004)); accord In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig., 153 F. Supp. 2d 935, 946 (S.D. Ind. 2001); Thorne v. Pep Boys Manny Moe & Jack Inc., 980 F.3d 879, 883 (3d Cir. 2020). Moreover, the long history of states regulating warranty law, including by providing remedies for breach, may further weigh against preemption. See Wyeth, 555 U.S. at 565; Chrysler Corp. v. Tex. Motor Vehicle Comm'n, 755 F.2d 1192, 1205 (5th Cir. 1985); cf. Cantero v. Bank of Am., N. A., 602 U.S. 205, 218 (2024).

But assume these two counterarguments are in play here, and take them up just below.

### 1.   Private Right of Action

The Defendant's first counterargument: the the Safety Act does not supply a private right of action, see id. at 11-12, and this implies that the Act preempts the Warranty Claims.

But this is off the mark.

The Safety Act's text explicitly allows state warranty claims, see Part IV.B, and that trumps a possible surmise as to congressional intent based on the absence of a private right of action.  Why does the text prevail?  Because it is "the best evidence of Congress's pre-emptive intent," CSX Transp., Inc., 507 U.S. at 664 (emphasis added) --- and certainly better evidence than what is not in the text, a private right of action.

### 2.   Recall Cases

The Defendant's second counterargument invokes two cases, Cohen v. Subaru of America, Inc., 2022 WL 721307 (D.N.J. Mar. 10, 2022), and Black Stone Auto Export, Inc. v. Hyundai Motor Am. (Inc.), 2021 WL 6102499, at *3 (11th Cir. Dec. 23, 2021).  See Motion to Dismiss at 14.

These cases are not on point.

Neither concerned possible preemption of a state warranty law. See Cohen, 2022 WL 721307, at *37 (claim for negligent recall); Black Stone Auto, 2021 WL 6102499, at *3 (claims for breach of contract and promissory estoppel).  This is a meaningful difference, given that the Safety Act explicitly "saves" warranty claims from preemption.  See Part III.B.[21]

---

[21]  Note that the Cohen plaintiffs brought various state-law warranty claims, see 2022 WL 721307, at *9, but the defendant did not argue they were preempted.  See id. at *9, *37.  Cohen discussed the preemption of those claims only in dicta, and its conclusion does not help the Defendant here: "warranty remedies have been explicitly preserved by the" Safety Act.  Id. at *37.

Moreover, the plaintiffs' claims in <u>Cohen</u> and <u>Black Stone Auto</u> were mainly challenges (of which more in a moment) to the way a recall was unfolding.

Why is this telling?

Because there is plainly some possible federal-law/state-law tension when state law is used to second-guess how a recall (controlled by the federal Safety Act) is unfolding.  In the end, that may or may not lead to a judicial determination that there is preemption.  But in that circumstance, there is a plain-enough <u>trigger</u>, a solid and obvious reason to kick off a preemption analysis in the first place.

Not so here.

The Warranty Claims pressed by the Plaintiffs are not a challenge to a recall of the Cars or how it was handled. Indeed, the Warranty Claims do not depend on the existence of a recall.  With or without a recall, the Plaintiffs' core Warranty Claims allegations would be the same: we were promised a fix but did not get it.

Bottom line: here, the Warranty Claims are not premised on a challenge to the federal recall and how it went; but in <u>Cohen</u> and <u>Black Stone Auto</u>, that sort of challenge was the key ingredient of the state-law claims --- and such a state-law challenge to federal law makes for precisely the sort of problem that preemption doctrine in its "very essence" exists to take on.  <u>M'Culloch</u> v. <u>Maryland</u>, 17 U.S. (4 Wheat.) 316, 427 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.").

*     *     *

To see this in sharper relief, look more closely to the cases.

Start with <u>Cohen</u>.

There, the plaintiffs challenged how a recall based on federal law was carried out.  <u>See</u> Second Amended Complaint ¶¶ 399–401, <u>Cohen</u>, 2022 WL 721307.  The plaintiffs alleged that Subaru was negligent in failing to notify them of a defect.  <u>See</u> <u>id</u>. ¶ 401. And the Court found "little practical difference between a court-ordered recall and a court finding that Subaru could have or should have performed a better recall."  <u>Cohen</u>, 2022 WL

721307, at *38.  That is why it dismissed the plaintiffs' negligent-recall claim.  See id. at *40.

As to Black Stone Auto, same thing.

There, the plaintiffs also directly challenged an ongoing federal recall.  See 2021 WL 6102499, at *1.  Hyundai chose to compensate the owners of recalled vehicles, as the federal Safety Act's recall scheme allows.  See id. at *2.  But a few months later, it conditioned its payments on the presentation of certain information.  See id. at *1.

A dealership that owned some recalled cars sued Hyundai, objecting to the new conditions.  See id.  It argued that the manufacturer's decision to compensate owners of the recalled cars was a "legal offer" to form a contract "independent of and outside the framework of the . . . [federal] Safety Act."  Id. (quoting amended complaint).

The plaintiff brought claims for breach of contract and promissory estoppel.  See id.  The district court dismissed them.  See id.  And the court of appeals affirmed.  See id. at *4.  It did so because it answered "yes" to one key question: whether the "[p]laintiff's attempt to recover damages . . . constituted an attempt to enforce a recall remedy under the Safety Act."  See id. at *3.

The case here is different.

The Plaintiffs here are not trying to use state law to seek damages for the way in which a federal recall unfolded or to "enforce" a federal recall, as in Cohen and Black Stone Auto, respectively.

Rather, they are trying to use state law to seek damages for alleged non-enforcement of a warranty.  The premise of their claim is not a federal recall that assertedly was not handled well; it is an alleged warranty from the Defendant.

The Cohen/Black Stone Auto situation, in short, presents a possible preemption issue.  But the situation here is a long way from the sort of federal-law/state-law tension that preemption doctrine aims to tackle.[22]

_____

[22]  Another way to put all of this is to note that the Warranty Claims here do not arise from a recall or from federal law as to how recalls are supposed to go.  Rather, express warranty claims

### C.    Conclusion

The Warranty Claims are not preempted by the federal Safety Act. This was Congress's choice in the Act, see Part IV.B, and the Defendant's counterarguments, see Part IV.C, do not tilt the scale back the other way.

### V.    The Texas Notification Requirement

The Defendant presses one final threshold argument: that the Court must dismiss one of the Warranty Claims, the Texas warranty claim at Count VI.  The reason: "failure to allege [the Plaintiffs'] compliance with the Texas notice requirement." Motion to Dismiss at 30.[23]

_____

are generally based on "the overt words or actions of the seller."  Express Warranty, Black's Law Dictionary (12th ed. 2024) (emphasis added); accord Cipollone, 505 U.S. at 504 ("[T]he 'requirements' imposed by an express warranty claim are not 'imposed under State law,' but rather imposed by the warrantor.") (cleaned up); see also id. at 504 n.23.  And that is how express warranties work under the causes of action invoked here by the Plaintiffs.  See Cal. Civ. Code § 1791.2 (defining "express warranty" as "[a] written statement" by a "manufacturer, distributor, or retailer"); Tex. Bus. & Com. Code Ann. § 2.313 (describing express warranties as being made "by the seller").  And indeed the Defendant itself has noted that "liability for breach of an express warranty derives from, and is measured by, the terms of th[e] warranty."  Motion to Dismiss at 26 (quoting Cipollone, 505 U.S. at 504).  If there had been no recall here, the Plaintiffs would still have had their Warranty Claim.  Not so as to the plaintiffs' claims in Cohen and Black Stone Auto, which necessarily rested on the existence of federal recalls, because they challenged the way they were going.

[23]  Such an argument might not need reaching and resolving if a law other than Texas' applied here.  And indeed, the Defendant asks the Court to conduct a choice-of-law analysis.  See Motion to Dismiss at 24.  But not now.  To see why, look to New Jersey's choice-of-law rules, which control here.  See generally Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); 19 C. Wright & A. Miller, Fed. Prac. & Proc. Juris. § 4506 (3d ed.) (listing the two exceptions to Klaxon, neither of which applies).  Under these rules, a choice-of-law analysis

This argument does not work.

Under Texas' Business and Commerce Code, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Tex. Bus. & Com. Code § 2.607(c)(1).

While the Plaintiffs argue notice of "a problem" suffices, see Opposition Brief at 31-32, the Defendant says there must be notice that is more specific than that --- notice of an impending lawsuit. See Motion to Dismiss at 30 n.11.

The Plaintiffs have it right.

Per comment 4 to § 2.607 of Texas's Business and Commerce Code, notice of a lawsuit is not required. "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." See Tex. Bus. & Com. Code § 2.607 cmt. 4. "There is no reason . . . for requiring the notification to be [of] a claim for damages or of any threatened litigation or other resort to a remedy." Id.

And the Fifth Circuit has made it clear that comment 4 means what it says: "notice under section 2-607 need not be a specific claim for damages or an assertion of legal rights." E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 976 (5th Cir. 1976).

These standards[24] are readily met by the allegations in the Complaint.

_____

is not triggered by listing out differences between bodies of law. Rather, a litigant must show why the difference between one possibly in-play body of law and another "matters in a practical, real-life sense on the facts of the case." Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275, 286 (D.N.J. 2023) (citing McCarrell v. Hoffmann-La Roche, Inc., 227 N.J. 569, 584 (2017)). The Defendant does not try to do that.

[24]  The Defendant's argument for its own proposed standard rests on two Texas district court cases, Cole v. C.R. Bard, Inc., 2021 WL 784661 (S.D. Tex. Feb. 11, 2021), report and recommendation adopted, 2021 WL 784136 (S.D. Tex. Feb. 26, 2021), and Morgan v. Medtronic, Inc., 172 F. Supp. 3d 959 (S.D. Tex. 2016). See Motion to Dismiss at 30 n.11. But one of these cases seems to support both the Plaintiffs' position (with a suggestion that

Over the course of three months, the Texas Plaintiff allegedly contacted the Defendant's warranty-repair agent seven times and brought his vehicle in for repair at least three times. See Complaint ¶¶ 42-49. Moreover, the Texas Plaintiff allegedly contacted the Defendant directly and requested that it buy back his vehicle. See id. ¶ 49.[25]

This checks the box. Given these allegations, there is no reason to conclude that the notification requirement bars the Texas Warranty Claim.

## VI.  Merits

With the threshold issues set out above resolved, come now to the merits.[26]

### A.   The State Law Claims

The Defendant makes two arguments for why the Plaintiffs' state law claims for breach of express warranty (Counts II and VI) should be dismissed.

---

notice of "defects" is enough, see Cole, 2021 WL 784661, at *4) and the Defendant's position (with a suggestion that notice of a "lawsuit" is needed, see id. at *5). And as to the other case, the Defendant cites it for the proposition that "[c]ourts in Texas consistently hold that failure to provide pre-suit notice is fatal to a plaintiff's warranty claim." Morgan, 172 F. Supp. 3d at 970. But this does not settle the question, it only re-asks it: "notice," yes --- but of what? And in any event: if these cases mean what the Defendant says they do, how can they be squared with the Fifth Circuit's contrary approach?

[25] At one point, the Defendant argues that the "Plaintiffs nowhere allege that they sought --- and were refused --- repairs for a thermal event." Motion to Dismiss at 27. But this argument is limited to one sentence, and it is backed up by one case, which is far afield. If this argument was meant to be about Texas's notification requirement, the Defendant does not say so.

[26] Recall that "Warranty Claims" is an umbrella term. It covers three claims: one claim under California law (discussed below in Part VI.A), one under Texas law (also discussed in Part VI.A), and one under the federal Warranty Act (discussed in Part VI.B).

### 1.    The Warranty's Scope

First, the Defendant contends that the warranty on the Cars does not cover design defects --- but the Complaint, per the Defendant, alleges only design defects.  See Motion to Dismiss at 28.

The premise of this argument is solid.

The warranty covers parts that are "defective in materials or workmanship."  See Motion to Dismiss, Exhibit A, at 8.  And "the plain and ordinary meaning of the term 'defects in . . . materials or workmanship' unambiguously excludes 'design' defects."  Coba v. Ford Motor Co., 932 F.3d 114, 121 (3d Cir. 2019) (cleaned up); accord Sloan v. Gen. Motors LLC, 2017 WL 3283998, at *8 & n.5 (N.D. Cal. Aug. 1, 2017) (collecting cases); Salinas v. Ford Motor Co., 2016 WL 8461424, at *5 & n.4 (S.D. Tex. May 13, 2016) (collecting cases).

So the warranty here covers materials and workmanship defects --- but not design defects.

The question then becomes: are the alleged troubles with the Cars spelled out in the Complaint (a) defects related to materials and workmanship (which are in play under the warranty here) or (b) defects related to design (which are out of bounds under the warranty here)?

To answer, look to the various types of defects:

> [A] "materials" defect is a failing in the
> quality of the actual substances used to
> make a product; a "workmanship" defect is a
> deficiency in the execution of a product's
> assembly or construction; and a "design"
> defect is a flaw inherent in the product's
> intended operation and construction.

Coba, 932 F.3d at 121 (cleaned up).

The Plaintiffs argue that the alleged defect here is one of materials or workmanship, not design.  See Opposition Brief at 31.  They say that the alleged defect was caused by bent anode tabs and torn separators; those could not have been part of the design, they argue, because that would have been "absurd," since such flaws are "not part of the design of any functional battery."  Id. at 30-31.  The battery, in short, was designed to come out one way but came out another, because of a hitch during

29

assembly or manufacturing.  That is what made it defective, the Plaintiffs say, not a sub-par design.

This argument is supported by the Complaint, which states that "[t]he anode and cathode are supposed to be separated at very precise dimensions by an electrolyte solution and a separator." Complaint ¶ 78 (emphasis added).  Yet they connect, it is alleged, because of a "a physical failure in the materials or in the manner of their assembly."  Id.

These allegations, the Court concludes, are focused on what is plainly a materials or workmanship defect --- and therefore can fit in under the warranty here.[27]

### a)    Counterargument: "Uniform"

The Defendant's main counterargument is that the Complaint invokes the "uniform" quality of the alleged defects --- and this suggests that the defects were actually design defects, which are not covered by the warranty.  See Motion to Dismiss at 29.

But this argument is puzzling.

In an era of mass production, it is hard to know why the "uniform[ity]" of a defect necessarily suggests that it is the result of a poor design.

Maybe the assembly line did not put things together well and that impacted all of the products that came down the line in the same way?  Or maybe the materials placed on the line were shoddy, and as a result all of the products that were built were sub-par.

The former is a workmanship defect; the latter is a materials defect --- and each can readily produce a "uniform" result.

---

[27]  This conclusion is not changed by the fact that, per the Complaint, the Defendant "knew by Summer 2019 . . . that the [Cars] . . . were defectively designed or manufactured." Complaint ¶ 106 (emphasis added); see Motion to Dismiss at 29 (citing id).  Whatever the Defendant suspected at a certain point in time, the Complaint as a whole makes clear that the defect allegedly ended up not being one of design.  See, e.g., Complaint ¶¶ 13, 27, 39, 51, 78, 172-73, 176, 206-07, 217.

There is, in short, no reason to assume that across-the-board flaws in mass-produced products must always and only be surface indications of bad design.

That assumption would make sense if the only standardized thing about mass production were standardization of design.

But there is reason to assume that. Mass production typically relies on standardization of production --- and standardized production means that possible workmanship and materials issues can cascade in a "uniform" way through all the products that are produced. See generally Constanze Clarke, Automotive Production Systems and Standardization: From Ford to the Case of Mercedes-Benz (2005); Organizational Improvement and Accountability: Lessons for Education from Other Sectors 38-39 (Brian Stecher & Sheila Nataraj Kirby eds., 2004); see also, e.g., Kavita Pilaniya et al., Recent Trends in the Impurity Profile of Pharmaceuticals, 1 J. Advanced Pharma. Tech. & Rsch. 302 (2010) (describing various manufacturing errors that could be uniform).

The Defendant, which bears the burden here, see Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005), does not tackle these sorts of questions --- or meaningfully explain why allegations about "a physical failure in . . . materials," Complaint ¶ 78, do not add up to a materials defect, or why allegations of how "[t]he anode and cathode are supposed to be separated," id., cannot be chalked up as a problem of execution. See Coba, 932 F.3d at 121 (defining "a deficiency in the execution of a product's assembly or construction" as a non-design defect).

### b)    Counterargument: Cases

The Defendant's second counterargument is that the alleged defects claimed here by the Plaintiffs are not covered, based on the authority of three federal cases. See Motion to Dismiss at 28-30 (citing Cummings v. FCA US LLC, 401 F. Supp. 3d 288, 314-15 (N.D.N.Y. 2019); Coba, 932 F.3d at 121; Catalano v. BMW of N. Am., LLC, 167 F. Supp. 3d 540, 555 (S.D.N.Y. 2016)).[28]

But tick through the cases and their relevance here falls away.

---

[28]  These cases were decided under the law of New Jersey and New York, not the law of Texas and California, whose statutes are the ones in play for now. See footnote 23.

The Defendant cites <u>Cummings</u> for the proposition that the "Plaintiffs are 'really alleging a design defect,'" since the alleged defect is uniform.   <u>See</u> Opposition Brief at 29.

But there the plaintiff alleged a "defectively <u>designed</u> 9-Speed transmission" and a "defectively <u>designed</u> and unsafe" transmission.   <u>Cummings</u>, 401 F. Supp. 3d at 314—15 (emphasis added).   Therefore, the court held, the "overall [c]omplaint suggest[ed] . . . a design defect."   <u>Id</u>.   Not so here, where the allegations are on their face related to workmanship and materials.

And more: the <u>Cummings</u> plaintiff, the court there noted, had not alleged a "widespread flaw in the manufacturing process."   <u>Id</u>. at 315.   But the Plaintiffs here have.   <u>See</u> Complaint ¶ 78.

If anything, <u>Cummings</u> suggests that the right course here is denying the motion to dismiss in favor of discovery.   "[W]hether the alleged defect arose from a faulty design or faulty manufacturing cannot be ascertained absent discovery because information related to the manufacturer's intention is within the sole possession of the manufacturer" --- at least when "the plaintiff had made sufficiently broad allegations to encompass defects in material and workmanship."   401 F. Supp. 3d at 314.

This is not an argument for cutting off the Plaintiffs' claims without seeing what discovery yields.   Quite the opposite.[29]

*       *       *

Come now to the two other cases cited by the Defendant, <u>Coba</u> and <u>Catalano</u>.

One of the cases, <u>Coba</u>, was decided on summary judgment.   <u>See</u> 932 F.3d at 116.   By that point, discovery had failed to turn up "any evidence supporting the existence of" a "manufacturing

---

[29]   And note the numerous cases that suggest discovery, and not a 12(b)(6) dismissal, is appropriate in this context.   <u>See</u>, <u>e.g.</u>, <u>Shaaya</u> v. <u>Jaguar Land Rover N. Am. LLC</u>, 2022 WL 2341599, at *9 (D.N.J. June 29, 2022); <u>Cummings</u>, 401 F. Supp. 3d at 314; <u>Miller</u> v. <u>Hyundai Motor Am.</u>, 2017 WL 4382339, at *5 (S.D.N.Y. Sept. 29, 2017); <u>Marshall</u> v. <u>Hyundai Motor Am.</u>, 51 F. Supp. 3d 451, 467 (S.D.N.Y. 2014); <u>Haag</u> v. <u>Hyundai Motor Am.</u>, 969 F. Supp. 2d 313, 316 (W.D.N.Y. 2013).

defect," contrary to the allegations in the complaint.  See id. at 123 n.9.

The point: when a warranty covers only a non-design defect, then a lack of evidence of a non-design defect can lead to a grant of a summary judgment (as in Coba).  And similarly: when a warranty covers only a non-design defect (as here, see Part VI.A), a lack of allegations of a non-design defect can lead to a grant of a motion to dismiss (as the Defendant seeks in this case).

This is all true, but none of it matters for now --- because in this case there are allegations of a non-design defect, as discussed above.

And Catalano, too, is distinguishable.  The complaint there contained "nothing specific . . . to suggest that the defects complained of were caused by a flaw in [the defendant's] global manufacturing process."  167 F. Supp. 3d at 555.  But here, the Complaint alleges just that.  See Complaint ¶¶ 30-31, 78.

## 2.   The Warranty's Terms

Where things stand: the Court has turned aside the Defendant's argument that the Plaintiffs' claims are categorically not covered by the Car warranty because those claims are design defect claims.  See Part VI.A.

Look now to the Defendant's next argument for why the state law Warranty Claims should be dismissed --- because the Defendant offered the Plaintiffs "exactly what was promised: free repairs."  Motion to Dismiss at 27.

To evaluate this argument, start with the warranty's text.  See Cipollone, 505 U.S. at 525 ("A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty.").

The warranty here promises that "repairs required to correct defects in factory-supplied materials or factory workmanship will be performed without charge upon presentment for service at an authorized [Defendant] retailer."  Motion to Dismiss, Exhibit A, at 8.  It added that covered components "will be repaired, or replaced."  Id.

Neither party disputes this.  Both frame their arguments around one question: did the Plaintiffs get successful repairs?  See Motion to Dismiss at 27; Opposition Brief at 29.[30]

Answering no, the Plaintiffs argue that they "received, at best, free repair attempts that failed to conform the vehicle to the warranty."  Opposition Brief at 29.

What allegations back up this argument?

First, the Plaintiffs allege that the repairs left each Car with "substantially impairing defects."  Complaint ¶¶ 23, 37, 50.

But the Defendant says back that this allegation is conclusory, and must be put aside on that basis.  See Reply Brief at 10.

Right.  To say that a product is defective, without elaborating on the defect, is too generic to count.  See, e.g., Wright v. Howmedica Osteonics Corp., 741 F. App'x 624, 626 (11th Cir. 2018) (discounting as conclusory statements that did not "allege in what way the product was defective").  By itself, such an allegation does not provide "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.

But the Plaintiffs go on to provide details.  They allege that they "(a) were told not to charge their vehicles above 75%, (b) not to park inside, (c) not to charge inside, (d) and to have a recall performed that would not prevent a fire, but would, at best, predict a fire"; and that there is "no fix" for these problems.  Complaint ¶ 56; see id. ¶¶ 24, 63, 79.

These allegations are not conclusory and would normally suffice.

But the Defendant contends that these allegations are factually wrong.  See Motion to Dismiss at 4-6 & n.5; Reply Brief at 10.

_____

[30]  In a footnote and then passingly in its reply brief, the Defendant cites Baranco v. Ford Motor Co., 294 F. Supp. 3d 950 (N.D. Cal. 2018), for the proposition that "inadequate repairs" are good enough.  See Reply Brief at 10-11; Motion to Dismiss at 27 n.10.  But "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived." John Wyeth & Bro. Ltd., 119 F.3d at 1076 n.6.  Regardless, the Baranco court based its analysis on a close read of the warranty at issue there.  See Baranco, 294 F. Supp. 3d at 973-74.  The Defendant has not explained how analysis of that contract bears on this case.

The allegations, it argues, "are contradicted by the Recall Letter."[31]  Reply Brief at 10.[32]

There is plainly something to this.  The Recall Letter contradicts the Complaint in key ways.  For example, the Plaintiffs allege that "vehicles that have had the recall performed cannot be charged beyond 75% at all."  Complaint ¶ 63; see also id. ¶¶ 24, 56, 79.  But this is at odds with the Recall Letter, which says the charging limit is temporary, just "an extra precaution, until the recall is completed and for the following 30 days."  Recall Letter at 2.

Despite these contradictions, the Plaintiffs have still alleged that the Car recall did not get them the successful repairs that both parties assume the Plaintiffs were entitled to.

The Plaintiffs' strongest allegation along these lines: the Defendant admitted that the Car recall would not work.  The Defendant informed them the recall "would not prevent a fire, but would, at best, predict a fire."  Complaint ¶ 56.  This alleged statement, seen in the light most favorable to the Plaintiffs, see In re Schering Plough Corp., 678 F.3d at 243, works as an admission by the Defendant of the recall's partial failure as to a basic and plainly critical issue --- preventing a fire.

Similarly, the Plaintiffs have plausibly alleged that the fix was not, and could not be, complete.  The Defendant, they plead, "openly admitted that it did not have any way" to fix the battery defect.  Complaint ¶ 59; see id. ¶ 79.

These alleged admissions do not necessarily seem to rest on the Recall Letter.  See Complaint ¶¶ 56, 59, 79.  But even if they did, the Recall Letter, when seen in the light most favorable to the Plaintiffs, does not directly contradict them.  The letter warns of "a risk of battery overheating" even after the recall. See Complaint, Exhibit 1, at 2.  And in such an event, it tells

---

[31]  The Recall Letter is at Exhibit 1 to the Complaint.

[32]  The Court assumes for present purposes that the Letter can be considered here.  (And it almost surely can be.  See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993); ULC Oil & Gas Field Servs. v. EXCO Res. (PA), LLC, 2014 WL 6607280, at *5 (W.D. Pa. Nov. 19, 2014) (collecting cases); 5A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1327 (4th ed. 2024).)

the Buyers to contact the Defendant for "repair," id., but suggests nothing about whether it will work.

The question is a close one.  But the Court concludes that the Plaintiffs have plausibly alleged that the recall did not generate the successful repairs that both parties assume the Car warranty promised.

*     *     *

In short: neither of the Defendant's arguments for dismissing the state law Warranty Claims is persuasive.  See Part VI.A.1, Part VI.A.2.  Therefore, on those claims, the motion to dismiss for failure to state a claim must be denied.

### B.    The Warranty Act

Finally, the Defendant moves to dismiss the federal Warranty Act claim, Count IX.

It offers two arguments.

First: that the Warranty Act claim fails because it is "coextensive with" the underlying state law Warranty Claims, which also fail.  See Motion to Dismiss at 31 (cleaned up).  Now that the Court has declined to dismiss the underlying state law claims, see Part VI.A, this argument does not work.

Second: the Defendant says that the Plaintiffs fail to allege that they have resorted to the Defendant's mandatory dispute-resolution process, as purportedly required by 15 U.S.C. § 2310(a).  See Motion to Dismiss at 31–32.

But compliance with a dispute-resolution requirement is typically thought of as an affirmative defense, so that an absence of allegations about it in the Complaint does not matter.  As one case has put it, dispute-resolution compliance is an issue "that [the Defendant] may raise, not that [the] Plaintiff[s] must negate in [their] Complaint."  Sanchez-Knutson v. Ford Motor Co., 52 F. Supp. 3d 1223, 1235 (S.D. Fla. 2014).

And many courts are on the same page.  See, e.g., George v. Jaguar Land Rover N. Am. LLC, 2021 WL 5195788, at *8 (D.N.J. Nov. 8, 2021); O'Connor v. Ford Motor Co., 567 F. Supp. 3d 915, 948 (N.D. Ill. 2021); Carter v. Ford Motor Co., 2021 WL 1165248, at *19 (S.D. Fla. Mar. 26, 2021); Lessin v. Ford Motor Co., 2020 WL 6544705, at *6 (S.D. Cal. Nov. 6, 2020); Johnson v. Nissan N. Am., Inc., 2018 WL 905850, at *3 (N.D. Cal. Feb. 15, 2018);

Persad v. Ford Motor Co., 2018 WL 3428690, at *6 (E.D. Mich. July 16, 2018); Lohr v. Nissan N. Am., Inc., 2017 WL 1037555, at *8 (W.D. Wash. Mar. 17, 2017); Glenn v. Hyundai Motor Am., 2016 WL 3621280, at *14 (C.D. Cal. June 24, 2016); Salinas v. Ford Motor Co., 2015 WL 13121265, at *5 (S.D. Tex. Sept. 3, 2015); Precht v. Kia Motors Am., Inc., 2014 WL 10988343, at *11 (C.D. Cal. Dec. 29, 2014); see also Maronyan v. Toyota Motor Sales, U.S.A., Inc., 658 F.3d 1038, 1043 (9th Cir. 2011); but see Bullard v. Jaguar Land Rover Auto. PLC, 2023 WL 4845873, at *10 (D.N.J. July 28, 2023) (stating that in some circumstances "a court may consider granting a motion to dismiss based on an affirmative defense") (cleaned up).

The Plaintiffs press this argument, see Opposition Brief at 35–36, but the Defendant says nothing back.  See Reply Brief at 12. Having left this argument unaddressed --- and therefore unrebutted --- the Defendant has not met its burden of persuasion on this part of its motion to dismiss.  Cf. Beazer E., Inc. v. Mead Corp., 412 F.3d 429, 437 n.11 (3d Cir. 2005) (stating in the appellate context that a reply brief's failure to address arguments made in an opposition brief "waives, as a practical matter anyway, any objections not obvious to the court to specific points urged" in the opposition brief).

## VII.  Conclusion

The motion to dismiss is denied with respect to each of the Warranty Claims, Counts II, VI, and IX.

IT IS on this 3rd day of March, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.